## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

**DOUGLAS GRAHAM,**

      **Plaintiff,**

v.

                                **Civil Action No. _____**
                                **JURY DEMANDED**

**MARIO KRANJAC, ESQ.,**

      **Defendant.**

_____/

## COMPLAINT

Plaintiff, Douglas Graham, offers the following as his complaint against the Defendant, Mario Kranjac, Esq.

### JURISDICTION

1. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) in that the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens or domiciliaries of different States. This Court has personal jurisdiction over the parties to this action in that the Plaintiff, Douglas Graham, has subjected himself to the jurisdiction of this Court, and the Defendant, Mario Kranjac, Esq., has his principal place of business in New York at 30 Wall Street, 12th Floor, New York, New York 10005, and committed the acts alleged herein in the State of New York.

### VENUE

2. Venue of this action is properly in this Court pursuant to 28 U.S.C. § 1391(a) in that a substantial part of the events or omissions giving rise to the claims occurred within this Court's judicial district.

## PARTIES

3.  Plaintiff, Douglas Graham is a citizen of the Country of Great Britain, and an alien with permanent status in the Unites States.  He is currently domiciled in the State of Connecticut at 117 Morgan Avenue, East Haven, Connecticut 06512.

4.  Defendant, Mario Kranjac, Esq., is a lawyer admitted to practice in the State of New York with registration number 2408193.  He has his principal place of business at Kranjac, Manuali & Viscovic LLP, 30 Wall Street, 12th Floor, New York, New York 10005.  At the time of the events giving rise to Mr. Graham's claims, Mr. Kranjac's principal place of business and the location from which the actions alleged in this complaint were taken was as a partner in the firm of Lazare Potter Giacovas & Kranjac LLP, 950 Third Avenue, New York, New York 10022.  Mario Kranjac, Esq., resides at 47 North Virginia Court, Englewood Cliffs, New Jersey 07632.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

5.  At some point in the late 1990s, Douglas Graham was introduced to Mario Kranjac, Esq., at a business function in New York City, and Kranjac solicited Douglas Graham's legal business.  Mr. Graham was at the time a partner and managing director of KPMG.

6.  While at KPMG, Mr. Graham worked on projects that fit with his interest and expertise in internet-based opportunities.  This was the early days of the internet, and Mr. Graham worked on several projects that focused on this new medium of communications.

6.  During the time that Douglas Graham was employed with KPMG or shortly thereafter, he hired Mario Kranjac, Esq., and his law firm Lazare Potter Giacovas & Kranjac LLP to represent him in various business interests.  In addition to a lawyer-client relationship, Douglas Graham placed his trust and confidence in Mario Kranjac, Esq., such that a fiduciary relationship

2

was established between Douglas Graham and Mario Kranjac, Esq., and the firm that Mr.
Kranjac worked for, Lazare Potter Giacovas & Kranjac LLP. Mario Kranjac, Esq., knew that
Douglas Graham was placing his trust and confidence in him and he willingly accepted this
responsibility and role.

7. In approximately February 2001, Douglas Graham left KPMG to start a company
known as IDDEX Corp. ("IDDEX"). The work behind IDDEX was an idea that Douglas
Graham had to help organizations -- corporate, academic and governmental -- to identify and
value intellectual property. He developed a software program to manage and value all types of
intellectual property at all stages of its lifecycle. He filed one of the first patents in the field and
wrote a widely accepted book on the subject. Mr. Graham has continued to develop and file
patents in this field. By any measure, Mr. Graham is an expert in this concept.

8. For help in the creation of IDDEX, Douglas Graham turned to his lawyer Mario
Kranjac, Esq., and his firm Lazare Potter Giacovas & Kranjac LLP, for legal and business advice
to start the project and get it off the ground. This was not the only project at the time for which
he used Mr. Kranjac's advice and counsel, there were other similar projects that they worked
together on such that Mario Kranjac, Esq., and the firm of Lazare Potter Giacovas & Kranjac
LLP, knew that Douglas Graham was placing his trust and confidence in Mario Kranjac, Esq. for
legal and business advice on a variety of projects and Mario Kranjac, Esq., encouraged Douglas
Graham to do so and willingly accepted this role.

9. The work of Douglas Graham with Mario Kranjac's help culminated in a closing that
occurred on September 12, 2000, at which time IDDEX Corp. was created and various investors
made capital investments in the company. The law firm of Fulbright and Jaworski LLP
represented the investors. Mario Kranjac, Esq., and his firm represented Douglas Graham's

3

interests in the creation of the company and in all facets of the transaction, a fact that was known to Mario Kranjac, Esq., his firm, and Douglas Graham.

10.   The structure of this transaction was for Douglas Graham and other founders to remain an ownership interest in the company IDDEX and the individual investors purchased convertible preferred stock in IDDEX with certain protections to protect their investment that were common and reasonable in the investment community at that time.  As will become significant, neither Mario Kranjac, Esq., nor any entity that he controlled or had an interest in enjoyed any ownership interest in IDDEX or management participation as a director or otherwise.

11.   Shortly after the creation of IDDEX, the terrorist attack on the citizens of the United States popularly known as the "9/11 terrorist attack" occurred.  The impact of this attack caused the investors and Douglas Graham, with Mario Kranjac's advice and counsel, to abandon the IDDEX project.  Douglas Graham relied on Mario Kranjac, Esq., for the legally proper way to wind down the affairs of IDDEX and ensure that the wind down was accomplished properly. Mario Kranjac, Esq., advised Dougals Graham that he had properly taken care of all steps necessary to accomplish the lawful wind down of IDDEX.  At the time of the wind down, it was a fact that Douglas Graham had assigned the patents in his process inventions that were critical to his IDDEX idea to IDDEX.

12.   After the failed start up of IDDEX, Douglas Graham accepted a position with an entity known as Circle Trust as Chairman and CEO, a company with approximately 8.5 billion in assets under administration and 1 billion under management.  During the succeeding years ending in approximately February 2006, Douglas Graham successfully wound down the affairs

4

of Circle Trust. In so doing Douglas utilized his lawyer, Mario Kranjac, Esq., and his firm Lazare Potter Giacovas & Kranjac LLP to perform much of the legal work.

13. At the conclusion of the work with Circle Trust, Douglas Graham began to discuss with his lawyer, Mario Kranjac, Esq., his desire to return to IDDEX. By this time the potential value in the idea behind IDDEX was well-known to Mario Kranjac, and he fully supported, and even encouraged Douglas Graham to return to the idea to the exclusion of any other investement or employment ideas available to him at the time.

14. During this same time, Douglas was approached to become CTO of an existing company that would have resulted in a lucrative salary and benefits of approximately $1,000,000 per year. Douglas Graham seriously considered this offer and sought Mario Kranjac's advice and counsel about accepting it in lieu of returning to the original IDDEX idea. Kranjac strongly discouraged Douglas Graham from accepting this offer, and instead pushed him into returning to the original IDDEX idea. Because of Mario Kranjac's advice, Graham turned down the offer and focused his attention on reviving the IDDEX idea with Mario Kranjac's encouragement and advice.

15. Unknown to Douglas Graham at the time, Mario Kranjac, Esq., secretly decided that he wanted to own all or a portion of the IDDEX idea, either for himself, or in conspiracy with others. He knew by this point that the idea was potentially very valuable and he was not content to serve as Douglas Graham's legal and business counselor for this project for a fee as he had on the original IDDEX creation. Instead, he wanted all or a substantial portion of the project for himself and perhaps others he was in conspiracy with.

5

16. Mario Kranjac knew that Douglas Graham would not agree to this, so he sought to secretly obtain control over the IDDEX idea or maneuver Douglas Graham into a position where he would be forced to give Mario Kranjac the ownership he wanted.

17. In furtherance of this scheme to defraud his own client, Mario Kranjac located a friendly investor with which he had a substantial relationship, and which he knew Douglas Graham did not know. Kranjac represented to Graham that this was the investor that Douglas Graham should use exclusively. When Douglas Graham protested and sought to approach the original investors and others that Douglas Graham knew, Mario Kranjac found reason after reason to disqualify them as suitable investor candidates. He knew that in the end Douglas Graham would follow his advice and he breached his duty to his client to discourage investors in favor of the investor he knew that he could use to manipulate his client to his benefit and to the detriment of Douglas Graham. In order to lure his client into accepting his advice on this, Mario Kranjac lied to Douglas Graham in order to get him to follow his advice in this regard, and he knew that because of the trust and confidence that Douglas Graham placed in him, it would be easy to get him to agree, and Douglas Graham did agree. But for Mario Kranjac's insistence, Douglas Graham would not have used Abdullah al Reyes to fund the start up of his company, but would have instead relied on the original IDDEX investors.

18. Mario Kranjac also advised Douglas Graham that he could not use the corporate vehicle IDDEX that was already in existence, instead advising his client a new corporate structure would be necessary. Unknown to Douglas Graham at the time, his lawyer secretly wanted to create a new company with rights, ownership and benefits in favor of Mario Kranjac and the entities he controlled or owned and to the detriment to his own client, Douglas Graham. Because the original IDDEX did not have any such features, it was not suitable for Mario

Kranjac's purposes.  In order to lure his client into accepting his advice on this, Mario Kranjac

lied to Douglas Graham in order to get him to follow his advice in this regard, and he knew that

because of the trust and confidence that Douglas Graham placed in him, it would be easy to get

him to agree, and Douglas Graham did agree to the creation of the new entity, but Douglas

Graham did not know about Mario Kranjac, Esq.'s plans to make this new entity so unfavorable

to Douglas Graham and favorable to Mario Kranjac.

19.  In furtherance of his scheme to defraud Douglas Graham, Mario Kranjac told his

client that the investor that he had located was a wealthy Saudi Arabian investor named Abdullah

al Reyes.  Mario was careful to limit Douglas Graham's contact with this investor, and Mario

Kranjac told Douglas Graham that Abdullah al Reyes had agreed to commit $500 million dollars

to fund the entire start up of the company and that with this investor no other investors would be

necessary.  This $500 Million was to be placed in a Trust Company, which would, in turn, be

administered by the new company they were creating.  This was a lie, but completely unknown

to Douglas Graham at the time. In order to lure his client into accepting his advice on this, Mario

Kranjac lied to Douglas Graham in order to get him to follow his advice in this regard, and he

knew that because of the trust and confidence that Douglas Graham placed in him, it would be

easy to get him to agree, and Douglas Graham did agree.  This Trust Company investment

structure was familiar to Douglas Graham because of his work with Circle Trust.  Mario Kranjac

knew this, of course, and it is an example of how Mario Kranjac used something he knew his

client, Douglas Graham, liked and was familiar with to get him to agree to using Abdullah al

Reyes as the sole investor -- a key to Mario Kranjac's fraudulent scheme.

20.  As an initial step in the deal, Mario Kranjac negotiated an initial investment of

$4,000,000 from Abdullah al Reyes in the form of a promissory note with a substantial portion of

the funds to be paid in June 2006 and with the remainder after closing in December 2006.

Unknown to Douglas Graham at the time, the real purpose of this interim funding was to allow

Mario Kranjac to keep Douglas Graham distracted with the start up of the new company so that

he (Mario Kranjac) could prepare the structure of the company without Douglas Graham's

interference so that he could add features to the company that would benefit Mario Kranjac and

perhaps others in conspiracy with him to his client Douglas Graham's detriment.   In order to

lure his client into accepting his advice on this, Mario Kranjac lied to Douglas Graham in order

to get him to follow his advice in this regard, and he knew that because of the trust and

confidence that Douglas Graham placed in him, it would be easy to get him to "drop his guard,"

and Douglas Graham did "drop his guard," and he did not involve himself in the negotiations.

21.   During this period, Douglas Graham (at Mario Kranjac's insistence) had very little

contact with Abdullah al Reyes or his agents, leaving the negotiations entirely to his trusted

lawyer and business advisor, Mario Kranjac.  Mario Kranjac knew that Douglas Graham was

putting his complete trust and confidence in Mario, and that it would therefore be easy to dupe

Douglas Graham in the formation and structure of the company into agreeing to things that

Douglas Graham would have never agreed to if he had known the truth about the deception of

Mario Kranjac.

22.  By this time, with Mario Kranjac's encouragement, Douglas Graham commenced

operations for the new company, investing eventually approximately $20,000 of his own money

in the new venture to pay for expenses.  With these funds and the funds initially invested by

Abdullah al Reyes in June 2006, Douglas Graham began to devote virtually his entire attention to

starting the company, working 12 hour days as the norm.  This fit beautifully with Mario

8

Kranjac's scheme, as he needed for his client, Douglas Graham, to be distracted so that he would not have the time to focus on the structure of the company.

23. Mario Kranjac targeted late November or early December 2006 for the closing of the investment by Abdullah al Reyes in the new company. He knew that Douglas Graham was busy and focused on the creation and operation of the new company and he also knew that Douglas Graham trusted him unconditionally. This he knew would allow him to create a business structure that was completely unfair to his client without his client knowing about it, at least until it was too late to do anything about it. In order to lure his client into accepting his advice on this, Mario Kranjac lied to Douglas Graham in order to get him to follow his advice in this regard, and he knew that because of the trust and confidence that Douglas Graham placed in him, it would be easy to get him to agree, and Douglas Graham did agree.

24. The closing of the new company, which was named GTC Holdings Group, Inc., later changed to Innovations International Americas, Inc. ("Innovation International"), occurred on December 13, 2006. The investment by Abdullah al Reyes was made through a company called Centum Prata (USA) Holdings, Inc. ("Centum"). Unknown to Douglas Graham, Mario Kranjac created a structure for the new company Innovation International that was vastly different than the structure of original IDDEX. Whereas Mario Kranjac's original role was solely as legal counsel, the new structure called for Mario Kranjac to have an ownership, either directly or through entities he owned or controlled totaling approximately 24% of the company pre-investment and 10.78% post investment.

25. Whereas Mario Kranjac had represented to Douglas Graham that Abdullah al Reyes was committing to invest over $500,000,000 to fund the project in full, this was a lie. In fact, he had only agreed to fund $4,000,000 of the project. The entire $500 Million Trust Company

representation Mario Kranjac made to Douglas Graham was a complete lie.  Mario Kranjac had

never had this discussion with al Reyes.

26.  Also, unlike IDDEX, Mario had a substantial and very unusual management role in

the new company that gave him effective control.  Under the new structure, Mario named

himself as a director of the company and as the permanent general counsel.  In this role he also

granted to himself an unusual power.  Through this power, he had the sole discretion to decide

what decisions where deemed to be "major decisions."  The significance of this was that all

major decisions required the approval of the investor Centum and the board.  The company

required that the board of directors be five in number with two representatives of the investor

Centum on the board and Mario Kranjac as the general counsel. This essentially gave Mario

Kranjac enormous power to control the new company to his benefit and to the detriment of his

client, Douglas Graham.  In addition, the structure of the company provided for what was known

as a "full ratchet" dilution feature that was extremely detrimental to Douglas Graham and the

other founders, and which would essentially leave them with little or no interest in the company

after subsequent rounds of investment in the new company.  For this reason, this structure was

extremely rare at the time as it left management with little incentive.  The preferred stock

dividend rate was also set at the rate of 20%, another feature that was not the standard rate for

similar deals at the time, and which was extremely detrimental to Mario Kranjac's client,

Douglas Graham.

27.  On the eve of closing of the transaction, Mario Kranjac knew that his client, Douglas

Graham was completely unaware of how the new company was structured and how this structure

operated to Mario Kranjac's benefit at the expense of his client, Douglas Graham.  He knew that

Douglas Graham was distracted with the operations of the new company and he had shared little

of the corporate structure with Douglas Graham and certainly did not disclosure these feature to

his client so that his client would understand the import of these features and how detrimental

they were to him. He also knew that Douglas Graham trusted him completely and that it would

therefore be quite easy to lure Douglas Graham into closing the transaction without full and

complete knowledge of the detrimental aspects of the transaction to Douglas Graham and the

beneficial aspects to Mario Kranjac.

28. Although Mario Kranjac did send copies of certain of the closing documents to

Douglas Graham just days before the closing, he knew that his client did not have time to digest

and understand the over 32 separate documents that comprised the closing package or to

understand the "fine print," and how the various documents fit together to create a structure, as

only a sophisticated corporate lawyer would. Douglas Graham asked lawyer shortly before the

closing what the structure of the company was, and Mario Kranjac assured him that "it was

standard, like the last closing (IDDEX)." From this representation, Douglas Graham thought that

the structure of the new company would mirror in all material respects the structure of IDDEX.

Unknown to Douglas Graham, his lawyer's representation was a lie, the company was vastly

different and in ways that were beneficial to Mario Kranjac but detrimental to Douglas Graham,

but the lie convinced Douglas Graham that his lawyer Mario Kranjac was fully protecting his

interests, as Mario Kranjac knew it would.

29. In order to further insure that his client would not discover his deception and breach

of duties to his own client, Mario Kranjac encouraged Douglas Graham not to attend the closing.

Instead, he asked Douglas Graham to sign various signature pages "in blank." Mario Kranjac

knew that Douglas Graham was completely distracted with the operations of the new company,

and would do as he was told by his trusted lawyer and business advisor. Upon the instructions of

Mario Kranjac, Douglas Graham executed several blank signature pages and did not attend the closing.

30. Because Mario Kranjac was obtaining an ownership interest in his client's company he was required to comply with the disclosure requirements of the applicable ethical rules. Among other requirement, these rules required: (1) that the transaction and terms were fair and reasonable to Douglas Graham and transmitted to him in a writing that could be reasonably understood by him; (2) that the writing advise Douglas Graham to seek the advice of independent counsel in the proposed transaction; and (3) that Douglas Graham thereafter consent in writing to proceed with the transaction. Mario Kranjac did not comply with this requirement or any other applicable ethical obligations and the proposed transaction represented a complete breach of Mario Kranjac's ethical duties to Douglas Graham in all respects.

31. After the closing, the first indication that Douglas Graham had that anything was amiss occurred at the second board meeting of the company in June 2007. At this meeting, Thalmer al Reyes, Abdullah al Reyes' son attended the meeting. At this meeting, Thalmer al Reyes asked why the business plan and projections referred to an additional contribution of capital and where the funds were coming from. This was a complete surprise to Douglas Graham and Chaith Kondragunta, the Chief Operating Officer, and revealed to him for the first time that his lawyer Mario Kranjac had misled him in this regard.

32. After this June 2007 meeting, Douglas Graham redoubled his efforts to obtain a copy of the actual closing package from the December 13, 2006, closing, which he still had not seen at this point. He continually asked for a copy verbally, by multiple e-mails and through at least two other staff persons, after the closing and was promised a copy, but Mario Kranjac avoided delivering a copy of the closing package. Unknown to Douglas Graham at the time, Mario

Kranjac avoided delivering a copy of the closing package because he did not want Douglas to discover the truth about the terms of the closing as well as discover his lies and breaches of fiduciary duty. Despite his concerns, he was told by Mario Kranjac that the investment issues were "a miscommunication," and that all would be fine.

33. In October 2007, at the regularly scheduled board meeting, in the face of increasing pressure from Douglas Graham, Mario Kranjac finally produced to Douglas Graham a copy of the closing package from the December 13, 2006, closing. This was the first time that Douglas had seen the package. Douglas Graham did not understand it, and so he went to a securities lawyer for guidance and understanding after the October 2007 board meeting ended. This was when he discovered for the first time what Mario Kranjac, his own lawyer, had lied to and deceived him into a company structure for his idea that he would have never agreed to had he understood.

34. Also at this meeting, Douglas Graham accepted an invitation to meet Abdullah al Reyes at his home in Riyad, Saudi Arabia, the following January for the next board meeting. The al Reyes family arranged for visas for Douglas Graham and Chaith Kondragunta. This alarmed Mario Kranjac as he did not want Douglas Graham to have direct contact with Mr. Al Reyes, and he began plotting to remove Douglas Graham from the company to prevent this contact and to complete his take over of the company from his own client. Whereas before, Mario Kranjac treated Douglas Graham like the client he was, he suddenly turned on Douglas Graham for the first time.

35. Immediately after the October 2007 board meeting, Mario Kranjac began to harass Douglas Graham in order to force him to leave the company. Mario went to others in the company in an effort to solicit their help in forcing Douglas Graham out. Those that would not

join Mario in seeking to force Douglas Graham out were harassed as well. When these efforts were unsuccessful, Mario Kranjac changed the locks on the company's offices and refused to give keys to Douglas Graham, Chaith Kondragunta or Dennis Dugan (effectively the entire senior management team). He also instructed junior management to take all of Douglas Graham's personal belongings and lock them away. The value of these personal belongings was at least $23,000. Mario Kranjac called an emergency board meeting on December 11, 2007, and terminated Douglas Graham and his ally, Chaith Kondragunta, the Chief Operating Officer of the Company. Mario had attempted to earlier solicit Mr. Kondragunta's help in ousting Douglas Graham, and when Mr. Kondragunta refused, he was fired along with Douglas Graham.

36.   Douglas Graham's contract with Innovation International called for him to receive a salary of $185,000 per year, later raised to $220,000, as well as expense reimbursement and other benefits. When he was wrongfully terminated by Mario Kranjac, he lost those benefits and his salary. The company also refused to pay him approximately $60,000 in outstanding expenses owed at that time, approximately $23,000 in personal property, and approximately $15,000 in funds owed an outside consultant hired by Douglas Graham for the company. In addition, Douglas Graham lost his initial investment in the amount of approximately $20,000, and an additional $10,000 in attorneys' fees he incurred with to attempt to remedy some of the breaches by his lawyer Mario Kranjac.

37.   Within approximately six months after Douglas Graham was terminated from the company he created, the company closed its doors and dissolved. Nevertheless, Mario Kranjac was paid hundreds of thousands if not millions of dollars in legal fees despite taking actions that he reasonably knew would cause the failure of Innovation International. It was during this time that Douglas Graham learned that his signature on a document purporting to transfer the process

14

patents created by him to Innovation International was forged.  Because Douglas Graham was

not aware of how Mario Kranjac had handled the issue of the intellectual property, he was

unaware until this point what Mario Kranjac had done.  Douglas Graham never agreed to transfer

the original process patents involving the IDDEX process to Innovation Internationl, therefore

Mario Kranjac's original corporate structure was flawed from the beginning as no arrangement

had been made with IDDEX or Douglas Graham to handle this key feature.

38.  After Douglas Graham's termination and the closing of Innovation International,

Douglas Graham was unemployed until he approached the original IDDEX investors, explained

to them what Mario Kranjac had done to him and IDDEX and they agreed to restart IDDEX.  He

is still without his salary and benefits from Innovation International and has lost at least three

years and the profits, salary and benefits he would have enjoyed -- 2006 through 2009 -- in

starting the company he sought to start with the advice and counsel of Mario Kranjac.  The

"new" IDDEX is successful, and but for the lies and deception of his lawyer, Mario Kranjac, it

would have been successful three years before now.


## COUNT I

## BREACH OF FIDUCIARY DUTY

39.  Paragraphs 1-38 are incorporated herein by reference.

40.  At all material times, a relationship of trust and confidence existed between Mario

Kranjac and Douglas Graham.  Mario Kranjac knew that Douglas Graham placed his trust and

confidence in him and he willingly accepted this responsibility and role.

41.  At all material times, Mario Kranjac served as Douglas Graham's lawyer and

business counselor.

15

42. As discussed more fully above, Mario Kranjac breached his fiduciary duty to his client.

43. As a direct and proximate cause of and but for Mario Kranjac's breach, Douglas Graham suffered damages, direct and consequential, economic and compensatory, and all in an amount that exceeds the jurisdictional limits of this Court, including but not limited to:

a. the loss of his original investment in Innovation International of approximately $20,000;

b. the loss of legal fees expended by him in furtherance of his attempt to remedy the breaches by his lawyer Mario Kranjac in the amount of approximately $10,000;

c. the loss of his guaranteed salary in the amount of $185,000 per year, later $220,000 together with the loss of his benefits in addition thereto, in a total amount that exceeds $500,000;

d. the loss of the expenses and personal property owed to him at the time of his termination in the amount of approximately $83,000; and

e. the loss of the future value of his investment in Innovation International and/or the lost of profits and benefits in IDDEX caused by the three year delay in restarting the company, an amount that exceeds $1,000,000.

44. In addition, in breaching the fiduciary duty owed to his client, Mario Kranjac acted intentionally and deliberately, with fraudulent or evil motive, or in consciously in willful and wanton disregard of his client, Douglas Graham's rights.

## COUNT II

## PROFESSIONAL NEGLIGENCE

45. Paragraphs 1-38 are incorporated herein by reference.

46. At all times material, Mario Kranjac was Douglas Graham's lawyer and owed him a fiduciary duty arising therefrom.

47. As discussed more fully above, Mario Kranjac breached the duty owed his client Douglas Graham.

48. As a direct and proximate cause of and but for Mario Kranjac's breach, Douglas Graham suffered damages, direct and consequential, economic and compensatory, and all in an amount that exceeds the jurisdictional limits of this Court, including but not limited to:

a. the loss of his original investment in Innovation International of approximately $20,000;

b. the loss of legal fees expended by him in furtherance of his attempt to remedy the breaches by his lawyer Mario Kranjac in the amount of approximately $10,000;

c. the loss of his guaranteed salary in the amount of $185,000 per year, later $220,000 together with the loss of his benefits in addition thereto, in a total amount that exceeds $500,000;

d. the loss of the expenses and personal property owed to him at the time of his termination in the amount of approximately $83,000; and

e. the loss of the future value of his investment in Innovation International and/or the lost of profits and benefits in IDDEX caused by the three year delay in restarting the company, an amount that exceeds $1,000,000.

49. In addition, in breaching the fiduciary duty owed to his client, Mario Kranjac acted intentionally and deliberately, with fraudulent or evil motive, or in consciously in willful and wanton disregard of his client, Douglas Graham's rights

## COUNT III

## FRAUD

50. Paragraphs 1-38 are incorporated herein by reference.

51. At all times material, Mario Kranjac owed Douglas Graham a duty of candor.

52. As discussed more fully above, Mario Kranjac made misrepresentations of fact to Douglas Graham which were false and which Mario Kranjac knew to be false or he made these representations or omissions of material fact for the purpose of inducing Douglas Graham's reliance thereon.

53. Douglas Graham justifiably relied on the misrepresentations or omissions of material fact from Mario Kranjac.

54. As a direct and proximate cause of and but for Mario Kranjac's breach, Douglas Graham suffered damages, direct and consequential, economic and compensatory, and all in an amount that exceeds the jurisdictional limits of this Court, including but not limited to:

a. the loss of his original investment in Innovation International of approximately $20,000;

b. the loss of legal fees expended by him in furtherance of his attempt to remedy the breaches by his lawyer Mario Kranjac in the amount of approximately $10,000;

c. the loss of his guaranteed salary in the amount of $185,000 per year, later $220,000 together with the loss of his benefits in addition thereto, in a total amount that exceeds $750,000;

d. the loss of the expenses and personal property owed to him at the time of his termination in the amount of approximately $83,000; and

e. the loss of the future value of his investment in Innovation International and/or the lost of profits and benefits in IDDEX caused by the three year delay in restarting the company, an amount that exceeds $1,000,000.

55. In addition, in breaching the fiduciary duty owed to his client, Mario Kranjac acted intentionally and deliberately, with fraudulent or evil motive, or in consciously in willful and wanton disregard of his client, Douglas Graham's rights

## **PRAYER FOR RELIEF**

WHEREFORE, PLAINTIFF PRAYS:

1. That this Court cause proper process to issue requiring the Defendant to answer this Complaint;

2. That the Court empanel a jury to try all issues so triable;

3. That this Court enter judgment against Defendant Mario Kranjac in favor of Douglas Graham and award him all of his actual damages, economic and compensatory, direct and consequential in an amount of at least $2,000,000;

4. That in addition to awarding Douglas Graham the actual damages he suffered, that the Court award punitive damages against Mario Kranjac in an amount not less than $5,000,000;

5. That this Court award Douglas Graham the costs of this cause, pre-judgment interest, and, to the extent permitted by applicable law, reasonable attorneys' fees; and

6. That this Court award Douglas Graham such other, further relief to which he may be entitled and which justice demands.


DATED this 11th day of December, 2009.

D. Andrew Byrne, Esq.
New York Bar No. 4543120
Florida Bar No. 0905356
Tenn. Bar No. 11431
BECKER & POLIAKOFF, P.A.
121 Alhambra Plaza, 10th Floor
Coral Gables, Florida 33134
305-262-4433
305-442-2232 (fax)
abyrne@becker-poliakoff.com

Counsel for Plaintiff, Douglas Graham

20

*charles* SCHWAB
BANK

**1106**

**DAVID ANDREW BYRNE**
212 E. 57TH ST. APT. 2C
NEW YORK, NY 10022-2812

84-221/1212
3000

Date *December 11, 2009*

Pay to the
Order of *Clerk of Court - US SDNY* | $ *350* *00*

*Three hundred fifty and* *00/100* Dollars

Charles Schwab Bank, N.A.
Reno, Nevada

**Investor Checking**

For *Graham v. Kanjac - Filing fee*

⑈⑈⑈2⑈2022⑈⑈⑈ 44000⑈753871⑈⑈ ⑈⑈06

©Clarke American